IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE

| | |
|---|---|
| **CHAD SNYDER** <br> 601 Forest Walk Lane, # 302 <br> Odenton, MD  21113 <br> <br> Plaintiff, <br> <br> v. <br> <br> **AEROTEK, INC.** <br> 7301 Parkway Drive <br> Hanover, MD  21076 <br> <br> <u>Serve</u>: CSC Lawyers Incorporating Servs <br>       Company <br>       7 St. Paul Street, Suite 820 <br>       Baltimore, MD  21202 <br> <br>       Defendant. | **CIVIL ACTION NO.:** <br> (Jury Trial Demanded) |

## **COMPLAINT**

Plaintiff, Chad Snyder ("Mr. Snyder" or "Plaintiff"), by and through his undersigned counsel, hereby brings this Complaint against Aerotek, Inc., ("Defendant"), by averring as follows:

### **INTRODUCTION**

1. The lawsuit is brought by Mr. Snyder, a former Payroll Supervisor, alleging discrimination in the terms, conditions, and discharge of employment on the basis of sex/gender and race/color.

2. Mr. Snyder's claims of discrimination arise pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., ("Title VII") and Maryland's anti-discrimination statute, MD. CODE ANN., STATE GOV'T § 20-606 ("Title 20").

1

3. These claims, supporting facts and damages set forth in this action are referred to individually or, at times, collectively as the "Lawsuit."

## THE PARTIES

4. Mr. Snyder (Caucasian/white) is an adult male resident of the State of Maryland who at all times relevant to this Lawsuit was an "employee" of Defendant within the meaning of Title VII and Title 20.

5. Defendant Aerotek, Inc., ("Aerotek") is a company formed and organized in the State of Maryland with a listed principal place of business at 7301 Parkway Drive, Hanover, Maryland 21076.

6. At all times relevant to this Lawsuit, Aerotek was an "employer" within the meaning of Title VII and Title 20. All actors and individuals identified in this Lawsuit were employees of Aerotek or its group of affiliated entities acting within the scope and course of their employment and authority

JURISDICTION AND VENUE

7. Jurisdiction of this matter arises under 28 U.S.C. § 1331 with a federal question involving Title VII. In addition, the Title 20 Maryland statutory claims set forth herein are so intertwined and related to the federal question so as to form a part of the same case and controversy, thus vesting this Court with supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a).

8. Venue is proper in the United States District Court for the District of Maryland under 28 U.S.C. § 1391(b) as the employment practices alleged to be unlawful were committed in Anne Arundel County, and more specifically, at Aerotek's principal place of business in Hanover where Mr. Snyder was previously employed.

## ADMINISTRATIVE UNDERTAKINGS

9. On or about May 14, 2021, Mr. Snyder timely filed a charge of discrimination with the Baltimore Field Office of the Equal Employment Opportunity Commissions ("EEOC"). The charge was dually filed with the Maryland Commission on Civil Rights ("MCCR").

10. By letter dated March 3, 2022, the EEOC issued a determination and notice of right to sue ("NRTS").

11. The Lawsuit is being initiated within 90 days after receipt of the EEOC's NRTS, and is further being initiated within two years of certain acts, events and omissions giving rise to these claims as required by Title 20.

12. All conditions precedent necessary to file the claims contained in this Lawsuit have been satisfied.

## FACTS
### Background Hiring and Promotions

13. Mr. Snyder is a former employee of Aerotek who was hired on February 9, 2015 as a Senior Payroll Specialist. In that position, he reported directly to Patricia Mason ("Ms. Mason")(Caucasian/female), the Junior Payroll Supervisor. His second line supervisor was Ana-Woods Hill ("Ms. Hill")(Caucasian/female), who held the position of Department Supervisor.

14. Mr. Snyder proved himself to be extremely valuable in his role, establishing strong customer and working relationships with other members of Aerotek's team.

15. In or around October of 2017, Ms. Hill left Aerotek, which created an opening for the Department Supervisor position. Ms. Mason was elevated to fill this role. For his part, Mr. Snyder was promoted to the position of Junior Payroll Supervisor.

16. Mr. Snyder excelled in his supervisory payroll position and he both met and exceeded the legitimate performance expectations of Aerotek and his supervisors, all of whom were female.

17. In short, Mr. Snyder's star was on the rise, and based on his exemplary accomplishments, he was *again* promoted on January 17, 2019 to the position of Payroll Supervisor, his second promotion in just over three years.

18. In his new position, Ms. Snyder reported directly to Ellen Siegman ("Ms. Siegman")(Caucasian/white/female), Aerotek's Payroll Manager. Upon his promotion, Mr. Snyder was charged with leading a team of two payroll specialists, those being Matthew Johnson ("Mr. Johnson") and Christina Piazza ("Ms. Piazza")(Caucasian/female).

19. Beginning in March of 2019 and continuing through the spring, Mr. Snyder began experiencing serious work performance issues with Ms. Piazza, including, but not limited to, her failure to complete tasks in a timely manner and providing substandard work. Mr. Snyder worked with Ms. Piazza, providing her extended time to complete her work. Despite his elasticity and support, Ms. Piazza continued to fail in her performance. Mr. Snyder, therefore, had to counsel Ms. Piazza on these issues. He also apprised Ms. Siegman of the ongoing situation.

20. Ms. Siegman knew that Ms. Piazza was woefully deficient in her work performance and that she was not meeting the legitimate expectations of Aerotek.

21. Insofar as Ms. Piazza's continued issues were affecting Aerotek and would also reflect poorly on Mr. Snyder as her supervisor, Mr. Snyder sought assistance from Ms. Siegman, noting that his only expectation was that Ms. Piazza perform to the same standard as all

employees Mr. Snyder supervised. Mr. Snyder did not want to be seen as favoring one employee over another or burdening the other employees due to Ms. Piazza's refusal to complete her work

22. Unfortunately, instead of assisting Mr. Snyder in addressing these continued problems with Ms. Piazza, Ms. Siegman targeted Mr. Snyder and criticized him for addressing Ms. Piazza's work performance failings. Ms. Siegman expressed to Mr. Snyder that Ms. Piazza was experiencing some personal problems. In response, Mr. Snyder expressed to Ms. Siegman that many employees have personal problems but are expected to meet their minimal performance obligations and that he had already allowed Ms. Piazza many extra months to complete her work.

23. As a supervisor, Mr. Snyder had a responsibility to address an employee who was a poor performer and who was being insubordinate.

24. Ms. Siegman's response was to scold Mr. Snyder for not understanding Ms. Piazza and to call him out as, somehow, not having proper communications with females in the workplace.

25. Mr. Snyder concerned that he was being directed to treat Ms. Piazza more favorably because, as a female with a personal problem. Ms. Piazza's was not working under a reasonable accommodation or any other legally protected status.

26. Though he was uncomfortable with the special treatment Ms. Piazza was receiving, Mr. Snyder had to allow Ms. Piazza additional latitude.

27. Ms. Piazza was emboldened by Ms. Siegman's preferential treatment and she became even less productive.

### "Not Everyone is a White Man from Glen Burnie"

28.     Predictably, throughout the summer and fall of 2019, Ms. Piazza continued to have ongoing performance issues to the point where she became openly insubordinate towards Mr. Snyder because she knew that Ms. Siegman would protect her and not allow her to be held accountable.

29.     On or about January 15, 2020, Mr. Snyder had a one-on-one conversation with Mr. Siegman about Ms. Piazza's ongoing performance failings – which were known and obvious.

30.     Instead of providing support, Ms. Siegman again berated Mr. Snyder and caustically remarked that he needed to broaden his perspective because "not everyone is a white man from Glen Burnie."

31.     Ms. Siegman's heated inclusion of Mr. Snyder's race and gender during this discussion evidenced clear bias and that she viewed Mr. Snyder of being a racist misogynist because he was from Glen Burnie.   Her comments were not an errant statement.  Rather, embodied the stereotypes about males from Glen Burnie as being white, blue collar, redneck and ignorant about the manner in which to treat women and minorities.

32.     On at least one prior occasion, Ms. Siegman revealed she harbored express animus against males when she directed Mr. Snyder to write down a list of his former supervisors from his previous employers.

33.     After reviewing the list, Ms. Siegman pointed out that the supervisors on the list were all males and that because of this Mr. Snyder may not be open to listening to female supervisors.  Mr. Snyder was floored by these comments and was extremely troubled that Ms. Siegman was driven by this skewed and biased mindset.. .

34. Without limitation, the gender of Mr. Snyder's former supervisors had no bearing on his ability to perform his duties and listen to his supervisors. This is especially true given that Mr. Snyder had been successfully employed at Aerotek for several years all under the direction of multiple female supervisors.

35. Ms. Siegman asking, let alone put any meaning on the response that his supervisors were male, reflects her biased assumptions about "male" management styles. Her clear message in having Mr. Snyder go through the exercise and in pointing out that his prior supervisors were male is that, somehow, being male and having male supervisors meant to her that he was lacking in some way.

36. Notably, Aerotek submitted a position statement to the EEOC wherein it admitted that Ms. Siegman did, in fact, specifically call into question the fact that all of Mr. Snyder's prior supervisors were male.

<u>Ms. Siegman's Ongoing Preferential Treatment of Ms. Piazza</u>

37. On about March 15, 2020, Mr. Snyder again voiced concerns with Ms. Piazza's performance to Ms. Siegman. Ms. Siegman's reaction was to tell him to "seek to understand," meaning that he should excuse Ms. Piazza's performance failings because of her personal life.

38. Ms. Piazza's performance further devolved throughout the spring and summer and she continued to be openly insubordinate to Mr. Snyder.

39. On September 16, 2020, a meeting was held between Mr. Snyder, Ms. Siegman, Ms. Piazza, and Kristina Campbell ("Ms. Campbell"), another payroll supervisor. During this meeting, Mr. Snyder informed Ms. Piazza that she still had not made enough progress with her job performance. Mr. Snyder could tell that Ms. Siegman reacted negatively to this admonishment, even though it was completely based in fact.

40. Approximately two weeks later, on September 29, 2020, Ms. Siegman scheduled a one-on-one meeting with Mr. Snyder with regard to Ms. Piazza. During the meeting, she repeatedly sought to undermine Mr. Snyder's authority and excuse Ms. Piazza's documented performance issues.

41. For example, Ms. Siegman asked him: "Have you considered everything she is going through? Do you even want her to be successful?." She also remarked: "I can tell you don't trust her. One of you has sabotaged this relationship."

42. While Mr. Snyder was simply trying to enforce work standards consistently, irrespective of his subordinates' gender, Ms. Siegman was conveying that she wanted him to treat Ms. Piazza more gently because she was a woman. Mr. Snyder's supervisory responsibilities included ensuring tasks were completed timely. Insofar as Ms. Piazza was months overdue on a task, his role as a supervisor was to address these delays with Ms. Piazza, not ignore them.

43. Although Mr. Snyder had expressed continued and valid concerns about Ms. Piazza's work performance for over a year, Ms. Siegman failed to take these seriously because of her bias towards Mr. Snyder preference for Ms. Piazza as a woman. Ms. Siegman had already cast Mr. Snyder as having a narrow perspective and a lessened ability to work with women because he was a male. Her next move was to set him up for termination.

### Performance Improvement Plan

44. On October 23, 2020, Ms. Siegman placed Mr. Snyder on a Performance Improvement Plan ("Plan"). The Plan was imposed without justification because Mr. Snyder was not failing in any of his responsibilities. Further, it drafted with general and imprecise goals and measures, all of which made it impossible to know what was required, let alone meet the

requirements. The Plan noted a start date of October 16, 2020 and was set to conclude on November 30, 2020.

45. Mr. Snyder was shocked by the Plan, which was littered with a series of lies, misrepresentations and accusations that he had lost trust and failed to care about his direct reports, a clear reference to Ms. Piazza. Predictably, Ms. Piazza was not placed on any performance improvement plan and there was no mention of her insubordination and performance issues.

46. The Plan targeted Mr. Snyder for discharge, whom she regarded as being flawed due to being a white male from Glen Burnie.

47. One aspect of the Plan was ordering Mr. Snyder to undergo a Competency Analysis Report, which was internally referred to as a "360 Review." Notably, Mr. Snyder was the first employee in the payroll department that was ever subjected to a 360 Review.

48. In addition to ordering the 360 Review, Ms. Siegman began subjecting Mr. Snyder to hyper-scrutiny of his workplace duties by sitting in on all meetings Mr. Snyder attended, including one-on-one meetings he conducted with his direct subordinates, all of which served to embarrass him and undermine his authority.

49. The 360 Review involved comprehensive reviews by Mr. Snyder's peers, his subordinates, including Ms. Piazza and Ms. Siegman .

50. Mr. Snyder met or exceeded all metrics as scored by his peers, and he had very high scoring competencies throughout the assessment. Predictably, the only lower target areas were a direct result of the poor and biased reviews submitted by Ms. Piazza and Ms. Siegman herself. In other words, except for the input of Ms. Siegman and Ms. Piazza, the feedback submitted in the 360 Review was extremely positive.

51. On December 1, 2020, Ms. Siegman met with Mr. Snyder to discuss the 360 Review results. During the meeting, Mr. Snyder was informed that they would be focusing exclusively on the subordinate scores alone, which were negatively influenced by Ms. Piazza.

52. It is telling that Ms. Siegman focused on the only feedback that was negative and used only the tainted negative feedback (her own discriminatory views of Mr. Snyder and those of Ms. Piazza) to set Mr. Snyder up for the ultimate adverse employment actions

53. When Mr. Snyder made the point that due to the history between he and Ms. Piazza those scores would naturally be lower, Ms. Siegman responded and stated that he was being "biased" and "dismissive."

54. Mr. Snyder, however, was simply making a factual statement that given the small sample size (two direct subordinates and one indirect) which represented his subordinate scores, a negative history with one of these subordinates would reasonably be expected to negatively impact these scores.

55. Considering that Ms. Siegman had substantial knowledge of this history, she should have known that Mr. Snyder's comments about his scores, rather than being "biased" and "dismissive," reflected an obvious reality.

56. Mr. Snyder's scores did not exist in a vacuum; he would not be able to simply "focus on" and address the subordinate scores without addressing the tangible reasons that led to them – specifically, the history with Ms. Piazza – a documented poor performer.

57. As before, Ms. Siegman ignored Mr. Snyder's concerns about the situation with Ms. Piazza and ongoing preferential treatment, all of which impeded Mr. Snyder's ability to supervise. While Mr. Snyder simply brought up a valid point, Ms. Siegman construed him as

"dismissive" because she had already falsely cast him as having an inability to properly listen to female supervisors.

58. In line with Ms. Siegman's goal of terminating Mr. Snyder, Ms. Siegman ignored the plethora of positive feedback from the 360 Review and the praise given to Mr. Snyder by others in the workplace. Ms. Siegman disregarded the positive feedback and praise because her only goal was to conclude that Mr. Snyder was a problem.

59. For example, when Mr. Snyder pointed out to Ms. Siegman that there were many positive comments and the negative comments were from interested parties, Ms. Siegman cast this as Mr. Snyder's refusal to accept feedback and learn from it.

60. Ms. Siegman failed to take Mr. Snyder's concerns seriously because he she put no value in his concerns because he is a white male. Further, she interfered with his ability to do his job by disciplining him when he was carrying out his duties, which included ensuring that he held all his employees to the same standard and not treat female employees better

### **Termination**

61. On December 9, 2020, Mr. Snyder was involuntarily terminated from Aerotek.

62. On that day, Mr. Snyder received a phone call from David Benton of Human Resources and Ms. Siegman. During this call, Ms. Siegman accused Mr. Snyder of being insubordinate when going over the 360 Review during their meeting on December 1, 2020.

63. No mention was made of performance as a reason for termination during the call, although Aerotek has since changed their rationale for discharge in the position statement submitted to the EEOC.

64. Contrary to Ms. Siegman's accusation, Mr. Snyder was not insubordinate during the meeting on December 1, 2020. He did nothing other than present a valid and reasonable

11

reason as to why his subordinate scores on the 360 Review were lower, and his comments were far from insubordinate.

65. Notably, Ms. Piazza's continued recalcitrance, her refusal to do her work, and her failure to follow Mr. Snyder's work directions for over a year were not treated as insubordination.

66. Ms. Siegman made improper assumptions about Mr. Snyder based on her biased and discriminatory beliefs about males, white males, white males from Glen Burnie; and penalized and discharged Mr. Snyder for not giving the insubordinate female employee preferential treatment.

## COUNT ONE
## RACE/COLOR DISCRIMINATION- TITLE VII
(Discrimination in the Discharge of Employment)

67. Mr. Snyder incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

68. At all times relevant to this Lawsuit and in this Complaint, Mr. Snyder was an "employee" and the Aerotek was an "employer" within the meaning of Title VII.

69. The conduct as alleged throughout this Lawsuit and this Complaint constitutes discrimination and disparate treatment on this basis of Mr. Snyder's race/color (Caucasian/white) in violation of Title VII.

WHEREFORE, Mr. Snyder demands judgment against Defendant and seeks the following relief:

    A. Back pay, front pay and other economic damages;

    B. Compensatory damages;

    C. Prevailing party attorneys' fees, expenses, and costs;

    D.    Pre and Post-Judgment interest; and

    E.    Equitable relief.

## COUNT TWO
## GENDER DISCRIMINATION- TITLE VII
(Discrimination in the Discharge of Employment)

70. Mr. Snyder incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

71. At all times relevant to this Lawsuit and in this Complaint, Mr. Snyder was an "employee" and the Aerotek was an "employer" within the meaning of Title VII.

72. The conduct as alleged throughout this Lawsuit and this Complaint constitutes a discriminatory discharge on this basis of Mr. Snyder's gender (male) and or gender plus race/color (male/Caucasian/white) in violation of Title VII.

WHEREFORE, Mr. Snyder demands judgment against Defendant and seeks the following relief:

    A.    Back pay, front pay and other economic damages;

    B.    Compensatory damages;

    C.    Prevailing party attorneys' fees, expenses, and costs;

    D.    Pre and Post-Judgment interest; and

    E.    Equitable relief.

## COUNT THREE
## RACE/COLOR DISCRIMINATION- TITLE 20
(Discrimination in the Discharge of Employment)

73. Mr. Snyder incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

74. At all times relevant to this Lawsuit and in this Complaint, Mr. Snyder was an "employee" and the Aerotek was an "employer" within the meaning of Maryland State Government Article, §20-602, *et seq.* ("Title 20").

75. The conduct as alleged throughout this Lawsuit and this Complaint constitutes discrimination and disparate treatment on this basis of Mr. Snyder's race/color (Caucasian/white) in violation of Title 20.

WHEREFORE, Mr. Snyder demands judgment against Defendant and seeks the following relief:

    A. Back pay, front pay and other economic damages;

    B. Compensatory damages;

    C. Prevailing party attorneys' fees, expenses, and costs;

    D. Pre and Post-Judgment interest; and

    E. Equitable relief.

**COUNT FOUR**
**GENDER DISCRIMINATION- TITLE 20**
(Discrimination in the Discharge of Employment)

76. Mr. Snyder incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

77. At all times relevant to this Lawsuit and in this Complaint, Mr. Snyder was an "employee" and the Aerotek was an "employer" within the meaning of Title 20.

78. The conduct as alleged throughout this Lawsuit and this Complaint constitutes a discriminatory discharge on this basis of Mr. Snyder's gender (male) and or gender plus race/color (male/Caucasian/white) in violation of Title 20.

WHEREFORE, Mr. Snyder demands judgment against Defendant and seeks the following relief:

     A.    Back pay, front pay and other economic damages;

     B.    Compensatory damages;

     C.    Prevailing party attorneys' fees, expenses, and costs;

     D.    Pre and Post-Judgment interest; and

     E.    Equitable relief.

## DEMAND FOR TRIAL BY JURY

Mr. Snyder demands a trial by jury in this action on all causes in this Lawsuit.

Respectfully Submitted,

/s/ Ruth Ann Azeredo
Ruth Ann Azeredo  (No. 16175)
1997 Annapolis Exchange Parkway
Suite 300
Annapolis, MD  21401
(410) 558-1915
(410) 558-1917 Fax
ruthazeredo@comcast.net

Timothy W. Romberger
Fed. Bar No. 014408
1025 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C.  20046
(202) 248-5053
(703) 582-6494 Cell
timromberger1@comcast.net

Date:  May 31, 2022